**UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(Eastern Division)**

| | |
|---|---|
| In re:<br><br>TLC AMERICAS LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 10-_____ |

**EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING**

**("FINANCING MOTION")**

The above-captioned debtor and debtor in possession (the "**Debtor**") hereby moves this Court (the "**Motion**") for entry of an order (the "**Order**"), in substantially the form attached hereto as Exhibit A: (a) authorizing the Debtor to obtain postpetition financing pursuant to §§ 105, 361, 362, 363, and 364 of the Bankruptcy Code (as defined below) and; (b) scheduling a final hearing pursuant to Rules 4001(b) and (c) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 4001-2 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Massachusetts ("**MLBR**" or the "**Local Rules**"). In summary, the Debtor seeks to enter into a DIP Financing Agreement (hereinafter defined) pursuant to which the Debtor will borrow up to $100,000 in principal funds from TLC Marketing System Ltd., a company formed under the laws of England and Wales with the registration number 06540370 (the "**Lender**"), subject to the terms and conditions provided therein. Although interest on the facility will accrue during the Projection Period (hereinafter defined), interest will not be due and payable until the Maturity Date, as that term is defined in the DIP Financing Agreement. In exchange for these financial accommodations, the Lender will be granted, pursuant to § 364(c)(1) of the Bankruptcy Code, an administrative claim allowable under § 503(b), and, pursuant to §§ 364(c)(2), a security interest in and/or a lien on the Debtor's unencumbered assets, excluding Avoidance Recoveries (as that term is defined in the DIP

Financing Agreement). The Lender's claim and liens, however, shall not be entitled to priority over, and expressly shall be subordinated to, the "Priority Professional Expenses." The facts and circumstances supporting this Motion are set forth in the *Declaration of Jacen Dinoff, Chief Restructuring Officer of TLC Americas LLC, in Support of "First Day" Relief* (the "**First Day Declaration**"), filed concurrently herewith.

In support of this Motion, the Debtor respectfully states as follows:

### JURISDICTION

1. The Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2. The statutory bases for the relief requested herein are §§ 105, 361, 362, 363, and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "**Bankruptcy Code**").

### BACKGROUND

**A.  The Debtor's Bankruptcy Case.**

3. On the date hereof (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Case**"). The Debtor continues to operate its business and to manage its property as debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or statutory committee has yet been appointed in this Chapter 11 Case.

4. The factual background regarding the Debtor, including its business operations, its primary debts, and the events leading to the filing of this Chapter 11 Case, is set forth in detail in the First Day Declaration, filed concurrently herewith and incorporated herein by reference.

**B.  Prepetition Operations and Events Leading to Bankruptcy.**

5.      The Debtor is a Massachusetts limited liability company that was organized, on information and belief, in or around August, 2002. On information and belief, based on information provided by and discussions with employees of the Debtor, for several years, the Debtor was a successful marketing and consulting firm, providing wholesale travel, leisure and lifestyle incentives and promotions also called campaigns, on behalf of other companies to attract consumers to their businesses. By way of example, if a manufacturer or retailer of a product or service (generally, a "**Sponsor**") desired to incentivize consumers to purchase its product or service by offering a reward, such Sponsor would contract with the Debtor to assist in developing and executing such promotion. The Debtor would be responsible for coordinating with any direct end-consumer which qualified for the reward under the Sponsor's promotion (*i.e.*, by making qualified purchases or ordering qualified services) by providing travel discounts or making travel arrangements, depending on the nature of the promotion and the reward offered.

6.      Originally, the Debtor consisted of three members: Mr. Nicholas True ("**True**"), Mr. Alec Johnson ("**Johnson**") and TLC Marketing Holdings LLC, n/k/a Togram, LLC ("**Togram**"), a Massachusetts limited liability company whose managing member is Mr. Walter Osterman ("**Osterman**," and together with True and Johnson, the "**Original Members**").

      A.     *Debtor's Execution of Promotions and Events Triggering Debtor's Financial Difficulties.*

7.      On information and belief, beginning as early as 2007, the Debtor began receiving complaints regarding the manner in which it was executing certain promotions. Specifically, on information and belief, the Debtor contracted with the following companies to design and execute the following promotions (collectively, the "**Promotions**"): (i) T-Mobile USA, Inc. ("**T-Mobile**"), to provide free airline tickets to any consumer who executed certain qualifying wireless service contracts with T-Mobile; (ii) Levi's//Dockers (collectively, "**Dockers**"), to provide free airline tickets to any consumer who makes a $125 qualifying purchase of Dockers products from participating

3

stores; and (iii) HSBC ("**HSBC**," and collectively with T-Mobile and Dockers, the "**Promotions' Sponsors**"), to provide free international airline tickets to any HSBC depositor who opens and maintains certain qualifying accounts during a specific timeframe. The Debtor believes that the complaints against it are without merit, as it maintains that it has performed all of its contractual obligations to the Promotions' Sponsors. Moreover, as set forth below, the Debtor believes that the Promotions' Sponsors, or any of them, failed to perform their obligations under the Promotions, and that the Debtor may assert claims against the Promotions' Sponsors, or any of them, for damages caused to the Debtor by the Promotions' Sponsors ' failure to address the consumers' complaints.

8.      The Promotions' Sponsors and, in some cases, the Debtor, were named as defendants in a number of lawsuits initiated by consumers who alleged that they did not receive their rewards pursuant to a particular Promotion. By way of example, with respect to the HSBC Promotion, the Debtor has been named as a defendant, along with HSBC, in an action alleging, among other things, breach of contract and violations of consumer protection laws. The litigation stemming from the Promotions (the "**Litigation**") has diverted, and continues to divert, the Debtor's management and resources from its focus on its business operations and threatens the Debtor's ability to maintain financial stability.

9.      Although the Debtor had no contractual obligations to individual consumers, the Debtor attempted to address certain of the complaints by offering alternative rewards on behalf of the Promotions' Sponsors. By way of example, on information and belief, the Debtor organized an automated call center whereby it contacted the population of direct end-consumers, believed to be in the millions, who qualified for the Dockers Promotion and offered them the choice of: (a) airline vouchers, (b) $150 in dining coupons, or (c) $125 (*i.e.*, the value of goods purchased to qualify for the Dockers Promotion). Customers were instructed to contact the Debtor and report its election. Upon information and belief, the Debtor paid millions to qualifying participants in the Dockers Promotion to resolve the complaints arising in connection with the Dockers Promotion.

4

10. In the Debtor's efforts to resolve complaints on behalf of the Promotions' Sponsors, the Debtor incurred costs and expenses for which it maintains it is entitled to reimbursement (the "**Reimbursement Claims**"). By way of example, on information and belief, with respect to the Dockers Promotion alone, the Debtor paid direct end-consumers collectively approximately $5.5 million, and the Debtor itself incurred $1.5 million in costs and expenses in operating the call center and overseeing payments. Although the Reimbursement Claims are disputed and unliquidated, the Debtor believes that they constitute one of the Debtor's most substantial assets.

    *B.  Disputes Among Debtor's Members Regarding Management.*

11. In 2008, at the time that the Debtor was working to resolve the complaints arising from the Promotions, disputes arose between the Original Members regarding the management of the Debtor. Subsequently, in or around November, 2008, the Debtor redeemed 75% of Togram's membership interests. As part of that transaction, TLC Marketing UK Ltd. ("**TLC UK**"), a foreign corporation organized under the laws of the United Kingdom and owned, in part, by True, was substituted as managing member of the Debtor. In or around May, 2009, Togram transferred and assigned its remaining interests in the Debtor to Mr. Brett Million ("**Million**").

12. In addition to the Debtor's incurrence of costs in connection with the Promotions and the Litigation, the state of the economy severely impaired the Debtor's operations, as companies scaled back their marketing budgets. Accordingly, the demand for the Debtor's unique services decreased sharply, and the Debtor began experiencing financial difficulties.

13. Although Togram and Osterman were no longer involved in the Debtor's management after the November 2008 redemption and the transfer of Togram's remaining memberships interests in May, 2009, Osterman, Togram, True and the Debtor engaged in a protracted dispute regarding various claims that each asserted against the other, and against or on behalf of the Debtor, concerning the business of the Debtor, including, without limitation, disputes over the causes of the Debtor's state of financial difficulty.

### C. The Settlement Agreement And Commencement Of This Case.

14. By late 2009, however, after extensive negotiations, the current and former members of the Debtors, along with other related persons and entities, reached a global settlement of all of their respective claims against one another. The settlement agreement dated December 8, 2009, which was subsequently amended in June, 2010 (as amended, the "**Settlement Agreement**"), expressly contemplates the Debtor's filing for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**").  A true and correct of the Settlement Agreement (including amendment) is attached to the First Day Declaration as Exhibit A.

15. The Settlement Agreement constitutes one of the primary motivations for the commencement of this chapter 11 case. The Settlement Agreement confers upon the Debtor substantial benefits, subject to its meeting certain conditions during this bankruptcy case. The Settlement Agreement provides, in relevant part, for the "TLC Parties" and the "Osterman Parties" to release one another from any and all claims, for the TLC Parties to indemnify the Osterman Parties from claims arising in connection with, among other things, the Promotions and the Litigation, and for the Osterman Parties to furnish a "Guaranteed Payment" of $225,000[1] and a "Contingency Payment" of $100,000. The Guaranteed Payment will be released from escrow to the Debtor after all of the conditions precedent identified in paragraph 12 of the Settlement Agreement, including the occurrence of the effective date of a chapter 11 plan of reorganization (the "**TLC Plan**") on or before December 31, 2010, have taken place or otherwise have been waived by the Osterman Parties. The Contingency Payment will be released from escrow to the Debtor if the TLC Plan, as confirmed,

---

[1] Pursuant to the June, 2010 amendment, the parties to the Settlement Agreement agreed to release from escrow $50,000 of the Guaranteed Payment to pay a retainer to Debtor's proposed bankruptcy counsel and to release $25,000 to Osterman in connection with his alleged guaranty obligations to Bank of America, N.A. Accordingly, the Guaranteed Payment currently is $150,000.

6

contains third-party releases in their favor which are acceptable to the Osterman Parties and which are approved by this Court as permitted under applicable law.

16. If the conditions precedent are not satisfied, then neither the Guaranteed Payment nor the Contingency Payment will be released to the Debtor. Settlement Agreement, ¶ 12. Moreover, the Settlement Agreement is subject to termination prior to December 31, 2010 if, among other things: (i) the Debtor fails to perform under the Settlement Agreement, *see id*., ¶ 12(b), (ii) this chapter 11 case is converted or an examiner is appointed, *see id*., ¶ 13(b), or the Settlement Agreement is rejected pursuant to §365(a) of the Bankruptcy Code, *see id*., ¶ 13(c). Notwithstanding the termination of the Settlement Agreement, the Debtor remains obligated to indemnify the Osterman Parties beginning as of December 13, 2010.

17. The Debtor is preparing to file a plan of reorganization as soon as practicable, to trigger the release of, at least, the Guaranteed Payment. Although contingent, the Guaranteed Payment constitutes a valuable asset of the Debtor's estate. If the Debtor satisfies all of the conditions precedent under the Settlement Agreement, the Guaranteed Payment will be available for payment of chapter 11 administrative expenses and to provide a distribution to the Debtor's general unsecured creditors. Based on the Debtor's preliminary analysis of outstanding claims of vendor and direct end-consumers (*i.e.*, the analysis does not include disputed claims that are the subject of Litigation or disputed commissions), there are approximately $1.6 million in general unsecured claims. Thus, the Debtor believes that the Guaranteed Payment, net of chapter 11 administrative expenses, and any other assets transferred to trust for the benefit of the general unsecured creditors under a plan of reorganization, will provide a meaningful distribution for such creditors.

C. **Prepetition Secured Debt.**

1. In or around November, 2008, the Debtor executed and delivered a promissory note in the principal amount of $1,500,000 to Togram in connection with the Debtor's

redemption of Togram's membership interest. To secure its obligations under the note, the Debtor allegedly granted Togram a security interest in substantially all of its assets. Togram filed a financing statement with the Office of the Secretary of State of the Commonwealth of Massachusetts identifying its security interest in the Debtor's assets.

2. On information and belief, the Debtor has satisfied its obligations under the promissory note to Togram, and any such alleged lien on and security interest in those assets is no longer enforceable. Togram has filed, or shortly will file, a release with respect to such financing statement.

3. Currently, the Debtor is not subject to any prepetition credit facilities or loans. The following parties have filed financing statements indicating a lien, security interest, or other interest in certain property held by the Debtor with the Office of the Secretary of State of the Commonwealth of Massachusetts:

| Secured Party Name | Amount Owed[2] |
|---|---|
| CIT Technology Financial Services, Inc. | $72,257.87 |
| CIT Technology Financial Services, Inc. | $34,589.36 |
| LEAF, as assignee of Direct Capital Corporation | $31,589.23 |
| US Bancorp, as assignee of Direct Capital Corporation | $25,836.02 |
| Jules and Associates, Inc. | $42,448.88 |

4. Additionally, certain creditors, including Bank of America, N.A. ("**BoA**") and Reilly Electrical, assert liens on, or rights of setoff with respect to, amounts held in the Debtor's bank accounts with BoA.

#### RELIEF REQUESTED

18. By this Motion, the Debtor seeks the authority to enter into a DIP financing facility up to $100,000.00 (the "**DIP Facility**"), which shall allow the Debtor immediately to borrow funds

---

[2] These figures are based on information and belief, based on a review of the Debtor's accounts payable records.

from the Lender.  A true and correct copy of the Post-Petition Financing Agreement (the "**DIP Financing Agreement**") is attached hereto as **Exhibit A**.  The DIP Facility shall be subject to the terms and conditions of the DIP Financing Agreement, shall bear the interest rate of prime rate plus 5.00% per annum.

19.     Because the Debtor intends to propose a plan of reorganization as soon as practicable, the Debtor does not anticipate the need for long-term financing, and accordingly, the maturity date of the DIP Facility is no later than December 31, 2010.  Moreover, the Debtor expects to generate working capital from its business operations such that cash collateral funds, along with the DIP Facility (if necessary), should be sufficient to pay all administrative expenses due and payable during the periods covered by the budget, a copy of which is attached hereto as **Exhibit B** (the "**Budget**").  The Budget sets forth the Debtor's estimated monthly cash receipts and disbursements for the period of July 19, 2010 to October 31, 2010 (the "**Projection Period**"), along with the anticipated timing and amounts that the Debtor intends to borrow under the DIP Facility.  The Debtor shall be permitted to request advances from the DIP Facility, and if no default first occurring postpetition exists at such time, the Lender shall make advances pursuant to such requests, which advances in a particular week shall be in an amount equal to the amount set forth in the Budget, subject to certain variances.

20.     The proceeds of the DIP Facility will be used by the Debtor to fund their working capital and general corporate needs during the administration of this Chapter 11 Case prior to the Maturity Date, the date through which the Lender has committed to finance the Debtor's ongoing operations.  Because budgeted expenses are based upon projections and actual expenses may vary from projected amounts and timing of occurrence, the Debtor respectfully requests, and the Lender has agreed, that it be authorized to pay any such actual expenses so long as they do not vary substantially from the projections, as more fully set forth in the proposed order authorizing the Debtor to obtain financing on an interim basis, attached hereto as **Exhibit C** (the "**Interim Order**").

9

21. Interest owed under the DIP Financing Agreement accrues during the Projection Period, but is not due and owing to the Lender until the Maturity Date.

22. As consideration for the DIP Facility, the Lender shall be granted an administrative claim pursuant to §§ 364(c)(1) and 503(b)(1)(A) of the Bankruptcy Code, and liens and security interests, pursuant to §§ 364(c)(2), in all prepetition and postpetition assets of the Debtor, excluding all Avoidance Recoveries (as that term is defined in the DIP Financing Agreement). The Lender's claim, and liens, shall not receive priority over, and in all respects shall remain subordinate to, the Priority Professional Expenses.

### BASIS FOR RELIEF

**A.  Authorization to Obtain DIP Financing**

*1.  Overview of DIP Loan*

23. The Debtor seeks authority to incur the DIP Facility from the Lender pursuant to the terms of the DIP Financing Agreement, to the extent necessary, to provide working capital for the Debtor's continued operations prior to the confirmation of a plan of reorganization. Among the primary terms of the DIP Financing Agreement and DIP Facility are the following:[3]

Purpose: To permit the Debtor to pay overhead costs, operating expenses, adequate protection, and administrative fees in accordance with the Budget.

Interest: Prime rate plus 5.00% per annum.

Maximum Outstanding Indebtedness: $100,000.00.

Funding Period End: Earlier of: (a) effective date of any Reorganization Plan, (b) the date on which payment of the Obligations is accelerated by Lender as provided in §10 and the Interim Order or the Final Order, as the case may be, and (c) December 31, 2010, if the Final Order shall not have been entered on or before such date.

---

[3] The following synopsis is provided for informational purposes only and serves only as a general description of the key terms of the DIP Financing Agreement. The terms of the DIP Financing Agreement and/or the Interim Order shall control in the event that the terms thereof are inconsistent with the discussion provided herein.

<u>Security</u>: Security for the DIP Facility will consist of a senior lien and senior security interest in all of the Debtor's assets, excluding Avoidance Recoveries. The liens and security interests shall prime and be senior to all other liens and security interests with the exception of the Permitted Liens.

<u>Commitment Fees</u>: None.

<u>Restrictions on Payments</u>: Payments shall be made solely for the purposes described in the Budget and in the amounts set forth in the Budget (subject to the Variance).

<u>Loan Funding</u>: Funding of the DIP Loan shall commence upon the entry of the interim or final order of the Bankruptcy Court approving the DIP Loan.

<u>Voluntary Prepayments</u>: Permitted in whole or in part, without premium or penalty.

24. The terms of the DIP Financing Agreement have been negotiated in good faith and at arm's length, and reflect the Debtor's exercise of its business judgment.

25. The Debtor is unable to secure financing from any traditional sources. Regardless of source, the Debtor is unable to obtain financing on terms better than those contemplated to be provided by the Lender pursuant to the DIP Financing Agreement and the Interim Order, since the Lender is willing to accrue interest and other charges arising under the DIP Facility until the Maturity Date. The DIP Facility will therefore preserve, maintain and enhance the value of the Debtor's assets while it formulates a plan of reorganization.

### 2. *The Interim Borrowing.*

26. The Debtor requests that the Court authorize the Debtor to immediately borrow the amounts set forth in the Budget during the period from and after the Court allows interim relief on this Motion until the Court considers allowance of this Motion on a final basis (the "**Interim Borrowing**"). The Interim Borrowing, if necessary, would be used to fund operations, to maintain the going-concern value of the Debtor's business, and to pay for the costs of this Chapter 11 Case, subject to the terms and conditions of the Bankruptcy Code and the DIP Financing Agreement.

### 3. *Request for Interim and Final Approval of the DIP Loan.*

11

27. Section 364 of the Bankruptcy Code allows a debtor to (a) obtain unsecured credit in the ordinary course of business, (b) obtain unsecured credit out of the ordinary course of business, (c) obtain credit with specialized priority, and (d) obtain secured credit by granting a secured lien on property of the estate. If a debtor-in-possession cannot obtain post-petition credit on an unsecured basis, the Court may authorize the obtaining of credit or the incurring of debt repayment of which is entitled to super-priority administrative expense status or which is secured by liens on the debtor's property.

28. Generally, §§ 364(c) and (d) of the Bankruptcy Code require a debtor to demonstrate that alternative sources of credit are not available under §§ 364(a) or (b). See In re Ames Dept. Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990)("debtor is not required to seek credit from every possible source … [but only to] show that it has made a reasonable effort to seek other sources of credit available.") Against this backdrop, a Court will evaluate the facts and circumstances of a debtor's case, and will grant significant weight to a debtor's business judgment regarding the necessity for obtaining the requested financing. Id. at 40.

29. In this case, the Lender is offering financing to the Debtor pursuant to which it has agreed to forego collection of an initial commitment fee and will allow interest to accrue, without any required payments from the Debtor, during the Projection Period. Given the Debtor's financial condition and the disputed and unliquidated nature of its primary assets (*i.e.*, the Reimbursement Claims), the Debtor submits that it would be unable to secure financing on terms better than those proposed by the Lender.

30. Moreover, notwithstanding the provision of an administrative claim and granting of security interests and liens as provided herein, it is currently anticipated that the Lender will be provided, in satisfaction of its claims arising in connection with the DIP Financing Agreement, an equity interest in the reorganized Debtor.

## NOTICE

31.     No chapter 11 trustee, examiner or creditors' committee has been appointed in this Chapter 11 Case.  Notice of this Motion has been served pursuant to MLBR 4001-2(b) upon the United States Trustee, each known local, state and federal taxing authority with a claim against the debtor, if any, secured creditors with an interest in the collateral, the Debtor's 20 largest creditors, the Lender, and any party who filed a request for service  In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is required.

## NO PRIOR REQUEST

32.     No prior request for the relief sought in this Motion has been made to this or any other court.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK.]**

DM3\1410178.4

**WHEREFORE**, the Debtor respectfully requests that the Court enter the Order, substantially in the form submitted herewith, (A) authorizing the Debtor to borrow up to $100,000 on the terms and conditions set forth in the DIP Financing Agreement and the Interim Order, (B) providing the Lender with claims and liens consistent with the terms of the DIP Financing Agreement and the Interim Order (C) scheduling a final hearing on thus Motion; and (D) granting such other and further relief as the Court deems appropriate.

**TLC AMERICAS LLC**

By its proposed attorneys,

Dated: July 16, 2010

/s/  Kara M. Zaleskas
Jeffrey D. Sternklar (BBO#549561)
jdsternklar@duanemorris.com
Kara M. Zaleskas (BBO #651981)
kmzaleskas@duanemorris.com

DUANE MORRIS LLP
470 Atlantic Avenue, Suite 500
Boston, MA 02210
Telephone: (857) 488-4200
Facsimile: (857) 488-4201